**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gary LESTER, Defendant-Appellant.**

**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Leroy "Obie" McGILL,**
**Defendant-Appellee.**

**UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

**Gary "Geek" LESTER,**
**Defendant-Appellee.**

**Nos. 83–1242, 83–1262 and 83–1268.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 9, 1984.

Decided Dec. 18, 1984.

Michael D. Howard, Michael Nerney, Asst. U.S. Attys., San Francisco, Cal., for plaintiff-appellee.

Marshall W. Krause, Esq., Krause, Timan, Baskin, Shell & Grant, Larkspur, Cal., Daniel H. Bookin, San Francisco, Cal., for defendant-appellant.

Before BROWNING, MERRILL, and SNEED, Circuit Judges.

SNEED, Circuit Judge:

These consolidated appeals follow the government's successful prosecution of Gary Lester and Leroy McGill for violations of 18 U.S.C. § 371 (conspiracy to obstruct justice and to obstruct a criminal investigation), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1510 (obstruction of a criminal investigation). The jury returned guilty verdicts against both defendants on all counts. Acting under Fed.R.Crim.P. 29(c), the district judge entered judgments of acquittal as to the two substantive counts for Lester and the conspiracy count for McGill. The government appeals from the judgments of acquittal for both defendants. Lester appeals from his conviction on the conspiracy count. We affirm Lester's conviction for conspiracy, set aside the judgments of acquittal as to both defendants, and reinstate the guilty verdicts.

## I.

## BACKGROUND

This case involves a conspiracy to prevent Leslie Brigham from testifying in a federal prosecution of Felix Mitchell, the alleged leader of an Oakland narcotics gang. In April 1983, the Oakland police department arrested Brigham for murder. While in custody, Brigham began cooperating with federal authorities as they prepared to prosecute Mitchell. Mitchell had been arrested in February 1983.

On April 17, 1983, while still in custody, Brigham was approached by Mitchell's attorney. The attorney urged Brigham not to cooperate with the federal authorities. In addition, she showed Brigham a note, authored by Mitchell, which directed him to refrain from testifying against Mitchell or speaking to the Justice Department Strike Force Attorney.

On or about April 15, 1983, Lester met with McGill and others to arrange Brigham's release from jail. This meeting apparently followed up a prior meeting in February 1983, attended by Lester and Mitchell, where Mitchell expressed concern that his own arrest was imminent and that Brigham might cooperate with the authorities. At the April 15 meeting, Lester said that the gang should get Brigham out of jail "because he [Brigham] was going to talk against Felix Mitchell." Accordingly, Lester approved the use of the gang's money for the purpose of securing Brigham's release; he instructed McGill to take $1000 to post as the cash part of Brigham's bail.

Before Lester or McGill could arrange Brigham's release, however, the Oakland police released Brigham into the temporary protection of the FBI. On April 18, 1983, the FBI checked Brigham and his wife into a San Francisco motel. Two days later, the couple left the motel and went to Brigham's sister's home in Oakland. There, Brigham called Tony Mitchell, Felix Mitchell's brother, and left a message that he was at his sister's home. A short time later, Lester called Brigham's sister and found to his surprise that Brigham was there. Apparently frightened, Brigham immediately called the Justice Department Attorney. While he was on the phone, however, Lester, Lester's brother Tony, and Tony Mitchell walked in. Brigham pretended he was talking to someone other

than the Justice Department Attorney, and he abruptly cut off the conversation. After some discussion and a telephone conversation with Mitchell, the parties agreed that Brigham should leave town for a time.

Brigham, accompanied by Lester's brother, then went to a motel in Alameda. Lester's brother paid for the room and left Brigham $300 in cash. He told Brigham to wait there until McGill came by in the morning.

McGill met Brigham the next day. The two stayed with their wives at another Alameda motel for three days. Needing money, Brigham and McGill drove to the house of Annie MacDonald, who gave McGill $500.

Brigham, McGill, and their wives then departed for San Diego, where they stayed for roughly three weeks. One of Mitchell's girlfriends paid for the accommodations in cash. While in San Diego, McGill periodically received money from Oakland, which he divided with Brigham. Evidence suggested that Lester's brother sent the money. On returning to Oakland, Brigham was arrested by the FBI.

Lester and McGill were charged by indictment with conspiracy, obstructing justice, and obstructing a criminal investigation. The government's case rested primarily on the testimony of two witnesses: Brigham and Norbert Bluitt, another alleged member of the gang. The jury returned guilty verdicts against both defendants on all counts. The district judge granted Lester's Rule 29 motion for acquittal on the two substantive counts, but he affirmed the conspiracy conviction; the judge acquitted McGill of the conspiracy count, but he affirmed the conviction as to the two substantive counts.

## II.

### ISSUES

The primary issue raised by these appeals is whether 15 U.S.C. § 1503 covers witness tampering of the sort suggested by the facts in the present case. In addition, Lester and McGill dispute whether there was sufficient evidence to convict either of them of the conspiracy count and to convict Lester of the substantive counts. McGill also disputes the applicability of 18 U.S.C. § 1510 (obstructing a criminal investigation) to the conduct charged. Finally, Lester and McGill raise a variety of objections to the presentation of certain evidence by the prosecution and the exclusion of certain evidence offered by the defense and to various alleged instances of prosecutorial misconduct. We shall address each of these issues in the order here stated.

## III.

### APPLICABILITY OF SECTION 1503

*A. Statutory Coverage*

Both Lester's appeal of his conspiracy conviction and the government's appeal of Lester's substantive count acquittal and of McGill's conspiracy acquittal center on the applicability of 18 U.S.C. § 1503 to witness-related offenses.[1] Lester and McGill con-

---

1. 18 U.S.C. § 1503 provides:

   Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States commissioner or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, commissioner, or other committing magistrate in his person or property

   on account of the performance of his official duties, or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

   The conspiracy charged in the instant case has two objectives: (1) obstruction of justice in violation of 18 U.S.C. § 1503, and (2) obstruction of a criminal investigation in violation of 18 U.S.C. § 1510. In *Stromberg v. California*, 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), the Supreme Court held that a general verdict of guilty must be set aside if the verdict is support-

tend that by enacting the Victim and Witness Protection Act of 1982, Pub.L. No. 97–291, 96 Stat. 1248, Congress intended to remove witness tampering from section 1503 and to consolidate all such offenses in a new provision, 18 U.S.C. § 1512.[2] The government argues that the omnibus clause in section 1503—which prohibits "endeavors to influence, obstruct, or impede, the due administration of justice" —reaches witness tampering of the type presented in this case.

■  Prior to the enactment of 18 U.S.C. § 1512, section 1503 prohibited influencing or intimidating "any witness ... any grand or petit juror, or officer in or of any court of the United States" or injuring any of them for discharging their duties in court. The Act removed from section 1503 all references to witnesses and enacted section 1512 to protect witnesses, victims, and informants. The Act, however, left the omnibus provision of section 1503 intact. Les-

ter and McGill argue that the Act evinces a congressional intent to redress all forms of witness tampering under section 1512, leaving section 1503 to remedy only tampering with court officers and jurors. We disagree.

As originally enacted, section 1503 had two objectives: " 'It [was] designed to protect witnesses in Federal courts and also to prevent a miscarriage of Justice by corrupt methods.' " *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir.1949) (quoting *Samples v. United States*, 121 F.2d 263, 265 (5th Cir.1941)). Undeniably, Congress passed the Act "to strengthen existing legal protections for victims and witnesses of Federal crimes." S.Rep. No. 532, 97th Cong., 2d Sess. 9 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2515. And Congress may well have intended to remove the protection of witnesses from section 1503. It by no means follows, how-

able on one ground but insupportable on another, and it is impossible to tell which ground the jury relied on in reaching its decision. In *Yates v. United States*, 354 U.S. 298, 311–12, 77 S.Ct. 1064, 1072–73, 1 L.Ed.2d 1356 (1957), the Court relied on *Stromberg* to reverse a conspiracy conviction where the statute of limitations had expired as to one of the two charged objectives of the conspiracy, and it was impossible to know which objective formed the basis of the jury's verdict. *See also United States v. DeLuca*, 692 F.2d 1277, 1281 (9th Cir.1982) (reversing multiple-objective conspiracy conviction where one objective found legally insufficient). Accordingly, should we find the § 1503 charge legally insufficient, *Stromberg* and *Yates* would require reversal of Lester's conspiracy conviction and affirmance of McGill's conspiracy acquittal.

2.  18 U.S.C. § 1512 provides, in relevant part:
(a) Whoever knowingly uses intimidation or physical force, or threatens another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
(1) influence the testimony of any person in an official proceeding;
(2) cause or induce any person to—
(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;
(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;
(C) evade legal process summoning that person to appear as a witness, or to produce a

record, document, or other object, in an official proceeding; or
(D) be absent from an official proceeding to which such person has been summoned by legal process; or
(3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings; shall be fined not more than $250,000 or imprisoned not more than ten years, or both.
(b) whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
(1) attending or testifying in an official proceeding;
(2) reporting to a law enforcement officer or judge of the United States the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings;
(3) arresting or seeking the arrest of another person in connection with a Federal offense; or
(4) causing a criminal prosecution, or a parole or probation revocation proceeding, to be sought or instituted, or assisting in such prosecution or proceeding; or attempts to do so, shall be fined not more than $25,000 or imprisoned not more than one year, or both.

ever, that Congress intended to reduce the effectiveness of section 1503 in combating "miscarriage[s] of Justice by corrupt methods." *See United States v. Beatty,* 587 F.Supp. 1325, 1333 (E.D.N.Y.1984). Yet this is precisely the result to which the defendants' urged construction would lead. If witness tampering should fall exclusively under section 1512, and if the accused used a method other than one prescribed in section 1512 (intimidation, physical force, threats, harassment, or misleading conduct), that conduct would no longer be prohibited. Neither section 1503 nor section 1512 would cover it. *See* Jeffress, *The New Federal Witness Tampering Statute,* 22 Am.Crim.L.Rev. 1, 20–23 (1984).

An examination of the scope of section 1512 and the scope of section 1503 prior to the enactment of section 1512 makes this clear. The witness tampering reached by section 1512 involves the use of force or coercion. Section 1512(a) proscribes knowing use of intimidation, physical force, threats, or misleading conduct to "cause or induce any person to ... be absent from an official proceeding to which such person has been summoned by legal process ...." 18 U.S.C. § 1512(a)(2)(D). With the exception of misleading conduct, which is not alleged in the present case, all of the activities proscribed by the provision involve some element of coercion. Similarly, section 1512(b) prohibits intentional harassment that "hinders, delays, prevents, or dissuades any person from ... attending or testifying in an official proceeding ...." 18 U.S.C. § 1512(b)(1). Although section 1512(b) apparently requires less force or intimidation than does section 1512(a), the gist of the offense is coercive conduct. As the Senate report notes, section 1512(b)

"covers any conduct that maliciously hinders, delays, prevents, or dissuades a witness or victim from ... attending or testifying in an official proceeding ... *if the conduct is done with intent to intimidate, harass, harm, or injure another person."* S.Rep. No. 532, 97th Cong., 2d Sess. 17 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News 2515, 2523 (discussing section 1512(a)(2), the precursor of section 1512(b)) (emphasis added); *see also* 128 Cong.Rec. H8469 (daily ed. Oct. 1, 1982) (remarks of Congressman Rodino) ("[T]he Senate amendment adds a new subsection describing a misdemeanor offense of intentionally harassing another person and thereby intentionally preventing any person from attending or testifying in an official proceeding .... The Senate language will reach thinly-veiled threats that create justifiable apprehension in a victim or witness. It does not reach mere annoyance, however, nor does it reach conduct, for example, that is not intended ... to prevent the witness from testifying ....").

The omnibus clause of section 1503, by contrast, is broader. It reaches conduct that "corruptly ... endeavors to influence, obstruct, or impede, the due administration of justice." In decisions prior to the enactment of section 1512, this court consistently has rejected the argument that the omnibus provision covers only activities obstructing justice that involve force, threats, or intimidation. *See, e.g., United States v. Brown,* 688 F.2d 596, 598 (9th Cir.1982); *United States v. Rasheed,* 663 F.2d 843, 850–52 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982); *see also United States v. Schaffner,* 715 F.2d 1099 (6th Cir.1983).[3] This provision includes noncoercive witness tampering,

---

3. This court has always adhered to the position that, as a criminal statute, § 1503 must be strictly construed. *See, e.g., Haili v. United States,* 260 F.2d 744, 745 (9th Cir.1958). Consequently, we have used the principle of *ejusdem generis* to limit the phrase "due administration of justice" to § 1503's prior enumeration of specific judicial functions. *See id.* at 745–46; *see also United States v. Brown,* 688 F.2d at 598 (interference with "'the due administration of justice' cannot be construed to proscribe conduct which takes place wholly outside the context of an ongoing judicial or quasi-judicial proceeding.").

Arguably, application of *ejusdem generis* limits the omnibus clause to prior language in § 1503 concerning injuring or threatening witnesses, jurors, and court officers. This court rejected such an argument and held that § 1503 reaches noncoercive conduct in *Rasheed,* 663 F.2d at 851–52, clarifying some dicta in *United States v. Metcalf,* 435 F.2d 754, 757 (9th Cir. 1970), that apparently took a contrary position.

and in *United States v. Gates*, 616 F.2d 1103 (9th Cir.1980), we upheld a conviction under section 1503 where the defendant had provided a witness with a false story to give to a grand jury. *See also United States v. Vesich*, 724 F.2d 451, 453–58 (pre-section 1512 case upholding obstruction of justice conviction for attempting to persuade a potential grand jury witness to testify falsely), *reh'g denied*, 726 F.2d 168 (5th Cir.1984).

So interpreted, section 1503 embraces the conduct of Lester and McGill who are charged, inter alia, with conspiracy to obstruct justice by hiding the witness Brigham to prevent his appearance at the trial of Felix Mitchell. Their efforts to secrete Brigham, manifestly done with the purpose of preventing his testimony,[4] constitute a corrupt endeavor to obstruct justice in violation of section 1503, at least as that provision stood prior to the Act. *See United States v. Schaffner*, 715 F.2d 1099, 1102–03 (6th Cir.1983) (pre-section 1512 case holding that section 1503 covers efforts to hide a witness). We do not believe Congress intended to change this result. Yet under the construction of the Act urged by Lester and McGill, noncoercive witness tampering—including hiding a witness—would fall outside both section 1512 and section 1503. Neither the legislative history nor the Second Circuit's decision in *United States v. Hernandez*, 730 F.2d 895 (2d Cir.1984) (exploring interplay between sections 1503 and 1512), supports such a result.

First, we cannot assume that when the Act was passed Congress was unaware of the wide assortment of cases extending the reach of section 1503 to noncoercive conduct, including noncoercive witness tampering. On that assumption, it would be improper to hold that Congress silently decriminalized noncoercive, but nevertheless corrupt, efforts to interfere with witnesses. Rather, we believe that Congress enacted section 1512 to prohibit specific conduct comprising various forms of coercion of witnesses, leaving the omnibus provision of section 1503 to handle more imaginative forms of criminal behavior, including forms of witness tampering, that defy enumeration.

The legislative history supports this view. The Senate version of section 1512 contained an omnibus provision which was very similar to that of section 1503.[5] In explaining its inclusion of the omnibus provision, the Senate Judiciary Committee noted that it intended the clause to reach interference with witnesses, victims, or informants that did not employ the means (coercion and deception) specified in other provisions of section 1512:

> There must also be protection against the rare type of conduct that is the product of the inventive criminal mind and which also thwarts justice ....
>
> ... The Committee does not intend that the doctrine of *ejusdem generis* be applied to limit the coverage of this subsection. Instead, the analysis should be functional in nature to cover conduct the function of which is to tamper with a witness, victim, or informant in order to frustrate the ends of justice .... irrespective of whether [there was] employed deception, intimidation, threat, or force ....

S.Rep. No. 532, 97th Cong., 2d Sess. 18 (1982), *reprinted in* 1982 U.S.Code Cong.

---

4. "[T]he word 'corruptly' as used in [§ 1503] means that the act must be done with the purpose of obstructing justice." *United States v. Rasheed*, 663 F.2d 843, 852 (9th Cir.1981), *cert. denied*, 454 U.S. 1157, 102 S.Ct. 1031, 71 L.Ed.2d 315 (1982).

5. The Senate omnibus provision, originally designated § 1512(a)(3), provided:

(a) Whoever ...

(3) corruptly, by threats of force, or by any threatening letter of communication, intentionally influences, obstructs, or impedes or attempts to influence, obstruct, or impede the—

(A) enforcement and prosecution of federal law;

(B) administration of a law under which an official proceeding is being or may be conducted; or

(C) exercise of a Federal legislative power of inquiry, shall be punished as provided in subsection (b).

128 Cong.Rec. S11439 (daily ed. Sept. 14, 1982).

& Ad.News 2515, 2524. Congress deleted the omnibus provision, however, and did not adopt it. In explaining this decision, Senator Heinz said:

Subsection (3) of section 1512(a) of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this witness protection measure. It also is probably duplicative of abstrusion [sic] of justice statutes already in the books.

128 Cong.Rec. S13063 (daily ed. Oct. 1, 1982).

Congress' decision to forgo adoption of the section 1512 omnibus clause reflects, we believe, its intent to limit section 1512 to instances of witness tampering involving coercion or deception, leaving inventive tampering by other means to section 1503. Such a construction leaves no gap in federal criminal law coverage of witness interference. This is what Congress intended.

The Second Circuit's decision in *United States v. Hernandez*, 730 F.2d 895 (2d Cir. 1984), does not invalidate this conclusion. There the defendant was charged, inter alia, with obstruction of justice in violation of section 1503 and with threatening a witness in violation of section 1512. The act forming the basis of the charges was the defendant's statement to a witness that unless the witness produced certain stolen checks the defendant would kill him. 730 F.2d at 897. The defendant was convicted under both sections. He appealed, asserting that threatening a witness is no longer covered by section 1503, being a violation of section 1512 only. *Id.*

The Second Circuit reversed the defendant's conviction under section 1503, concluding that "congress affirmatively intended to remove witnesses entirely from

the scope of § 1503." *Id.* at 898. This conclusion was not necessary to the court's result because the defendant's threats fell directly under section 1512. Whether they also fell under section 1503 was immaterial. And the court narrowed its opinion at a later point by observing that "by enacting [the Act] in 1982, Congress intended that *intimidation and harassment* of witnesses should thenceforth be prosecuted under § 1512 and no longer under § 1503." *Id.* at 899 (emphasis added); *United States v. Beatty*, 587 F.Supp. 1325, 1331 (E.D.N.Y. 1984).

■ In the present case, Lester and McGill hid a witness from the authorities to prevent his testimony at the Mitchell trial. Both Lester and McGill strenuously assert that no one coerced Brigham to go to San Diego. Taking that assertion at face value, their conduct lies outside "intimidation and harassment of witnesses"; however, it falls precisely within the residual omnibus clause of section 1503.[6] Here it is not the witness but the "administration of justice" that stands in need of protection. Extending that protection is the province of section 1503, not section 1512.

As this court long ago observed, "The obstruction of justice statute is an outgrowth of Congressional recognition of the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined." *Catrino v. United States*, 176 F.2d 884, 887 (9th Cir.1949). In our opinion, Congress did not intend to curtail that recognition or to restrict the coverage of section 1503 over imaginative methods of witness tampering not set forth in section 1512. Therefore, we conclude that section

---

**6.** A district court within the Second Circuit reached a similar conclusion in *United States v. Beatty*, 587 F.Supp. 1325 (E.D.N.Y.1984). In that case, the obstruction of justice charge rested in part on the defendant's efforts to persuade witnesses to give false testimony before a grand jury. The defendant argued that *Hernandez* required dismissal of the charge because § 1512 had removed all witness tampering offenses

from § 1503. The district court concluded that *Hernandez* required only that witness tampering involving coercion or harassment be prosecuted under § 1512. Accordingly, as no coercion was alleged, the court denied the defendant's motion to dismiss the § 1503 charge. 587 F.Supp. at 1330–33. We wholeheartedly concur with this reasoning.

1503 covers the conduct alleged in the present case.

### B. Sufficiency of the Evidence

Lester and McGill also contend that there is insufficient evidence to convict either of them of conspiracy to obstruct justice in violation of section 1503. Lester further challenges the sufficiency of the evidence underlying his conviction for the substantive obstruction of justice count.

The standard of review applicable to these arguments is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *e.g., United States v. Clevenger,* 733 F.2d 1356, 1358 (9th Cir.1984); *United States v. Arbo,* 691 F.2d 862, 866 (9th Cir.1982). This court is not to weigh conflicting evidence or consider the credibility of witnesses. Those are the functions of the trier of fact. *E.g., United States v. Carrier,* 654 F.2d 559, 561 (9th Cir.1981).

The principal evidence relied upon by the government to prove McGill's participation in the conspiracy was (1) testimony that McGill attended the meeting where Lester expressed concern that Brigham was going to testify against Mitchell and (2) evidence that McGill accompanied Brigham to San Diego and paid for the accommodations. McGill argues that this evidence does not demonstrate "an intention and agreement to accomplish a specific illegal objective ... sufficient to make one a conspirator." *United States v. Melchor-Lopez,* 627 F.2d 886, 891 (9th Cir.1980). He advances various alternative explanations for his behavior during the relevant period.[7]

■ However, the evidence need not exclude every hypothesis except that of guilt. The issue merely is whether the trier of fact could reasonably arrive at its conclu-sion. *United States v. Sears,* 663 F.2d 896, 905 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982).

■ We think it could. A rational trier of fact could have inferred that, in view of McGill's presence at the meeting where Lester discussed the problem presented by Brigham's potential testimony, his accompanying Brigham for several weeks in San Diego and his receipt of money from Lester's brother on several occasions during that trip would not have occurred absent some sort of agreement on his part. Accordingly, we conclude that there was sufficient evidence to support McGill's conviction for conspiracy.

In essence, Lester argues that, although there may have been a conspiracy to silence Brigham, there was insufficient evidence to link him with that conspiracy. Lester contends that

> mere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective is not sufficient to make one a conspirator.

*United States v. Melchor-Lopez,* 627 F.2d 886, 891 (9th Cir.1980).

We reject this argument. Again the question is whether there was sufficient evidence for a rational jury to conclude that "the defendant had at least a slight connection with the conspiracy and that the defendant knew he was connected therewith." *United States v. Miranda-Uriarte,* 649 F.2d 1345, 1352 (9th Cir.1981); *e.g., United States v. Arbelaez,* 719 F.2d 1453, 1458 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). Such evidence exists in the present case. The government presented evidence (1) that Lester acknowledged that Brigham would testify against Felix Mitchell; (2)

---

7. McGill asserts that his actions may be explained by a desire to accompany Brigham on a trip, as the two had grown up together, by a desire to have his trip paid for, by a desire to help protect Brigham because he was in poten- tial danger for having testified in an unrelated state case, by a desire to help Brigham elude the authorities who may be seeking Brigham for other wrongdoing, or by a desire to do as he was told.

that Lester approved the use of money for bail; (3) that Lester met Brigham immediately upon discovering that Brigham had been released; and (4) that Lester left $500 with MacDonald for McGill's trip to San Diego. Based on this evidence, a rational jury could have found that there was at least a slight connection between Lester and the conspiracy and that Lester knew of the conspiracy and willingly participated in it. *See United States v. Camacho,* 528 F.2d 464, 469–70 (9th Cir.) (jury could reasonably find illicit agreement from defendant's repeated participation in illegal transactions), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976). Therefore, we conclude that the evidence supports Lester's conviction.[8]

█ Lester further argues that the government's proof regarding the formation of the conspiracy and Lester's activities in relation to the conspiracy does not conform to the time requirement contained in the district court's charge to the jury. The district judge instructed the jury that the government had to prove that the conspiracy formed and that Lester joined the conspiracy "on or before April 15, 1983." [9]

Lester notes that the government did not allege that any of the overt acts set forth in the indictment took place on or before April 15; moreover, Lester asserts that the activities in which he allegedly participated—the bail discussion and the meeting at Brigham's sister's house—occurred after April 15. Accordingly, Lester argues that there was an irreconcilable and prejudicial discrepancy between the evidence and the jury instructions.

We disagree. Even assuming that the bail meeting took place a day or two after April 15, Lester has not demonstrated that the discrepancy resulted in any prejudice, as is necessary to give such a variance legal significance. Rule 52(a) of the Federal Rules of Criminal Procedure provides, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." The variance in the present case could not have misled Lester at trial or deprived him of his right to be protected against another prosecution for the same offense. *See Berger v. United States,* 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935); *see also United States*

---

**8.** The Ninth Circuit cases cited by Lester that reversed conspiracy convictions which were based on inadequate evidence are of no help to Lester here. In *United States v. Lopez,* the only evidence presented by the government was of the defendant's presence at various drug transactions and his acquaintance with several of the conspirators. 625 F.2d 889, 895–97 (9th Cir. 1980). In *United States v. Dunn,* the government presented little or no direct evidence linking the defendants with the conspiracy—a scheme to import hashish in empty computer cases—and instead presented evidence of the defendants' involvement in other transactions. The government demonstrated nothing illegal about the other transactions and failed to demonstrate any relation between those transactions and the primary conspiracy charged. 564 F.2d 348, 353–55, 357–58 (9th Cir.1977). And in *United States v. Melchor-Lopez,* each of the defendants insisted on conditions that were unacceptable to the others, with the result that no agreement was reached. 627 F.2d 886, 888–90 (9th Cir.1980).

In the present case, the evidence, viewed in the light most favorable to the government, shows that Lester was instrumental in bringing about the decision at the April 15 meeting to free Brigham and prevent his cooperation with

the authorities, that he approved the use of money for Brigham's bail, and that he left money with MacDonald to help finance the trip to San Diego. This shows more than Lester's mere presence at the meetings or acquaintance with the conspirators; the evidence directly links Lester with the conspiracy. Further, the parties to the meeting apparently reached an agreement and implemented it by sending McGill to San Diego. *Lopez, Dunn,* and *Melchor-Lopez,* therefore, are distinguishable.

**9.** The district judge gave the following instruction:

> [T]o establish a conspiracy as charged, the government must prove ... beyond a reasonable doubt:
>
> First: that there was an agreement to obstruct justice or to obstruct a criminal investigation starting on or before April 15, 1983
> ....
> ... [S]econd[:] ... that the defendant, the particular defendant joined that conspiracy sometime on or before April 15, 1983.

Record at 558–59. The judge further instructed the jury that "[t]he conspiracy which you must find to convict is the one charged in the indictment and not some other conspiracy." *Id.* at 559.

*v. Von Stoll,* 726 F.2d 584, 586–87 (9th Cir.1984) (variance between indictment and proof concerning the identity of the victim found not to affect any substantial right of the defendant); *United States v. Anton,* 547 F.2d 493, 496 (9th Cir.1976) (in a prosecution for possession of stolen mail, variance between indictment and proof as to whether the defendant stole the mail from an "authorized depository for mail matter" found not prejudicial). Nor is the timing of the conspiracy an integral element of the offense. It need not be proved precisely. *Arnold v. United States,* 336 F.2d 347, 352–53 (9th Cir.1964), *cert. denied,* 380 U.S. 982, 85 S.Ct. 1348, 14 L.Ed.2d 275 (1965); *accord United States v. Heimann,* 705 F.2d 662, 668–70 (2d Cir.1983). We conclude, therefore, that the variance claimed by Lester between the district court's instruction and the government's proof—assuming that such a variance indeed existed—did not prejudice any substantial rights of Lester.

■ Finally, Lester argues that there is insufficient evidence to convict him of the substantive obstruction of justice counts. Again, we disagree. "The law is clear that a defendant may be convicted of the substantive acts of his coconspirators, as long as those acts are 'committed pursuant to and in furtherance of the conspiracy.'" *United States v. Reed,* 726 F.2d 570, 580 (9th Cir.1984) (quoting *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979)); *e.g., United States v. Arbelaez,* 719 F.2d 1453, 1459 (9th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984). Lester, as a conspirator, is liable

for the substantive violations committed by his coconspirators, including, inter alia, McGill.

## IV.

### APPLICABILITY OF SECTION 1510

McGill also seeks to invalidate his conspiracy conviction by arguing that, even if the evidence shows an agreement to prevent Brigham from testifying against Mitchell, this does not constitute a conspiracy to violate 18 U.S.C. § 1510.[10] McGill argues that section 1510 does not cover efforts to obstruct the communication of information to federal law enforcement officials in connection with a witness' potential testimony at a trial or other judicial proceeding. In McGill's view, conduct occurring after the commencement of official proceedings is governed by other obstruction of justice statutes—i.e., 18 U.S.C. §§ 1503, 1505, 1512. McGill contends that the reach of these statutes and the reach of section 1510 are mutually exclusive. *See United States v. Mitchell,* 372 F.Supp. 1239, 1251 (S.D.N.Y.), *appeal dismissed sub nom. Stans v. Gagliardi,* 485 F.2d 1290 (2d Cir.1973). We disagree.

Admittedly, Congress enacted section 1510 "to plug a loophole in the protection the Government can provide to its own witnesses and informants" by extending protection to persons who wish to convey information to federal officials before the commencement of judicial or other proceedings.[11] H.R.Rep. No. 658, 90th Cong., 1st Sess. (1967), *reprinted in* 1967 U.S.Code

---

**10.** 18 U.S.C. § 1510 provides:
(a) Whoever willfully endeavors by means of bribery to obstruct, delay, or prevent the communication of information relating to a violation of any criminal statute of the United States by any person to a criminal investigator shall be fined not more than $5,000, or imprisoned not more than five years, or both.
(b) As used in this section, the term "criminal investigator" means any individual duly authorized by a department, agency, or armed force of the United States to conduct or engage in investigations of or prosecutions for violations of the criminal laws of the United States.

Should McGill be correct on this point, his conspiracy conviction would suffer from fatal ambiguity under the doctrine of *Stromberg v. California,* 283 U.S. 359, 51 S.Ct. 532, 75 L.Ed. 1117 (1931), and *Yates v. United States,* 354 U.S. 298, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). *See supra* p. 1291 n. 1.

**11.** Commencement of judicial proceedings invokes the protection of 18 U.S.C. § 1503; commencement of official proceedings before a federal agency or department or a congressional committee invokes the protection of 18 U.S.C. § 1505; commencement of "official proceedings" invokes the protection of 18 U.S.C. § 1512.

Cong. & Ad.News 1760, 1761. It does not follow, however, that section 1510 applies *only* to behavior occurring *prior* to the commencement of judicial proceedings. The statutory language contains no such limitation. *United States v. Koehler*, 544 F.2d 1326, 1330 (5th Cir.1977) ("The provisions of Section 1510 do not exclude its applicability merely because an indictment has been returned or judicial proceedings have been initiated . . . ."). And as we concluded in *United States v. Roberts*, the legislative history does not support such a limitation on the broad language chosen by Congress either:

> The fundamental danger to an informant or a witness arises from the fact as to whether or not he has supplied the Government with information. It is not whether a case is pending. The Federal Government should be able to provide the same protection and assurance to a witness or informant willing to go to the FBI or other Federal agency that it can at a later stage in the prosecution.

638 F.2d 134, 135 (9th Cir.) (quoting H.R. Rep. No. 658, 90th Cong., 1st Sess. (1967), *reprinted in* 1967 U.S.Code Cong. & Ad. News 1760, 1761), *cert. denied*, 452 U.S. 909, 101 S.Ct. 3039, 69 L.Ed.2d 411 (1981); *see also United States v. Gorny*, 732 F.2d 597, 605 (7th Cir.1984) (concluding that "the operation of section 1510 and section 1503 is not intended to be mutually exclusive" and that the defendant was properly convicted under section 1510 for conduct occurring after the commencement of judicial proceedings).

■ We therefore conclude that section 1510 reaches the conduct alleged in the present case. When viewed in the light most favorable to the government, the evidence suggests that the parties conspired to bribe Brigham by paying for his trip to San Diego in order to prevent his communicating with the Justice Department Attorney. This amply supports McGill's conviction for conspiring to violate section 1510.

McGill further argues that section 1510 does not apply because the evidence indicates that Brigham was an accomplice in the scheme to prevent his testimony. Although section 1510 does not apply to communications between accomplices to a scheme to obstruct a criminal investigation, *United States v. Cameron*, 460 F.2d 1394, 1400–02 (5th Cir.1972), McGill's argument proves too much. This is not a case like *Cameron;* Brigham did not bribe himself. *See id.* at 1402 ("Under neither logic nor law could [the accomplice] have been his own victim."). If McGill were correct, the victim of a scheme to use bribery to prevent communication with a federal investigator would always be an accomplice, because in return for the bribe (e.g., a free trip to San Diego), the victim would "voluntarily" refrain from communicating with the authorities. We decline to adopt such a stultifying interpretation. Accordingly, we conclude that McGill was properly convicted for conspiracy to violate section 1510.

## V.

## OTHER CONTENTIONS

### A. *Erroneously Included Evidence*

■ Both Lester and McGill claim prejudicial error in the trial court's admission, without limiting instructions, of evidence of Mitchell's narcotics operation and their connection to it. Because Lester and McGill insist that this evidence is only relevant to show their knowledge, motive, or intent under Rule 404(b), they argue that the trial court should have balanced specifically the probativeness of the evidence against its prejudicial effect and given a limiting instruction to cure any possible prejudice that remained. The trial court found the Mitchell narcotics ring evidence to be relevant to the proof of the conspiracy. It specifically rejected Rule 404(b) as the basis for admissibility. Therefore, no Rule 404(b) limiting instruction was required. Moreover, it is clear from the record as a whole that the trial judge conformed to Rule 403 by weighing the probative value of the evidence against the possibility of prejudice. *See United States v. Bradshaw*, 690 F.2d 704, 708–09 (9th Cir.1982),

*cert. denied,* —— U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983).

Lester also argues that the admission of testimony as to his possession of guns was irrelevant and unduly prejudicial in an obstruction of justice case not predicated on violence. The government referred to Lester's possession of weapons, however, only after the defense had brought up various shootings in cross-examining the government's witness. In this context, the district court's decision to admit evidence of Lester's possession of weapons cannot be viewed as so prejudicial as to be an abuse of discretion.

Lester next complains that the admission of Annie MacDonald's hearsay statement was unduly prejudicial.[12] However, had Brigham merely testified, first, that McGill asked MacDonald if Lester had left anything for him and, second, that MacDonald then gave McGill a sum of money—which is the substance of his testimony once the hearsay is excised—the probative effect would have been essentially the same. Thus, the marginal prejudicial effect of admitting the hearsay was slight and was clearly outweighed by its probative value in establishing Lester's participation in the conspiracy.

Finally, Lester objects to the prejudicial impact of Brigham's testimony that his brother had been murdered five years earlier by the Mitchell mob. The government adduced this evidence only after the defense implied that Brigham had voluntarily gone to San Diego. The evidence was therefore probative on the issue of whether the San Diego trip was indeed aimed at obstructing justice by interfering with a witness. Its admission does not constitute an abuse of discretion.

## B. *Erroneously Excluded Evidence*

Lester also asserts prejudicial error in the trial court's exclusion of three pieces of evidence. First, Lester claims it was error for the trial court to exclude a government witness' misdemeanor conviction for filing a false police report. After defense counsel had cross-examined the government witness Norbert Bluitt regarding various narcotics offenses to show bias, the trial judge sustained an objection to the defense inquiry into Bluitt's misdemeanor conviction. The exclusion of this evidence was error. Fed.R.Evid. 609(a)(2) provides that evidence of convictions of a crime involving dishonesty or false statement *shall* be admitted during cross-examination to attack the credibility of a witness. No discretion to exclude exists. *United States v. Glenn,* 667 F.2d 1269, 1272 (9th Cir.1982).

The error, however, was harmless beyond a reasonable doubt. While it is true that an erroneous restriction of a defendant's cross-examination of a government witness has constitutional implications, we are convinced that no Sixth Amendment rights of Lester were abridged. *See Chipman v. Mercer,* 628 F.2d 528 (9th Cir.1980). The jury had sufficient information to appraise the biases and motivations of the witness. *Id.* at 530. It heard evidence of Bluitt's prior criminal history and his expectation of government protection in exchange for his testimony against the appelants. Furthermore, Bluitt himself admitted on cross-examination that he would have lied for the "mob." Against this backdrop, the trial court's erroneous exclusion of his conviction for filing a false police report did not deprive the jury of relevant evidence nor did it constitute a meaningful restriction on Lester's right to cross-examine Bluitt. The district court's error was harmless beyond a reasonable doubt.

Lester next claims that it was error for the trial court to exclude the grand jury testimony of McGill's wife, Bonnie Harmason, who had accompanied McGill and Brigham to San Diego. This testimony would have ascribed an innocent motive to the trip. Harmason did not take the stand

---

**12.** Brigham testified that, when he and McGill went to MacDonald's home, McGill asked if Lester had left anything for them and that Mac- Donald said "yeah, $500 Gary left for you" and then took the money from under the sofa and gave it to McGill.

during the trial. The prosecutor objected to the admission of the grand jury testimony under these circumstances because he would be deprived of the opportunity to cross-examine Harmason with respect to an inconsistent version of this trip she gave in a statement made to the F.B.I.

■ The grounds employed by the trial judge in excluding this evidence are not clear. Perhaps he thought it was inadmissible hearsay because of its failure to conform to the requirements of Fed.R.Evid. 804(b)(1). This appears to be erroneous, inasmuch as the government had ample opportunity to cross-examine Bonnie Harmason during the grand jury proceedings. Perhaps the trial court simply considered it unfair to present a version of an unavailable witness' testimony without an opportunity to cross-examine directly. In any event, this is a matter for the trial judge's discretion, to be exercised on the basis of his evaluation of the realities of cross-examination and the motive and interest with which the government carried out the prior examination. 4 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 804(b)(1)[02] (1984). We believe the trial judge acted within his proper discretion in conducting this evaluation, especially given the likelihood of confusion occasioned by the admission of both Harmason's prior testimony and her statement to the FBI.

The final evidentiary error asserted concerns the invocation of the Fifth Amendment by a government witness. Defense counsel attempted to cross-examine Brigham in order to show bias and motive to cooperate with the government regarding a murder he allegedly committed. The district court upheld Brigham's claim of privilege against self-incrimination.

■ Evidence relevant to bias may be excluded because of the Fifth Amendment privilege. *See Coil v. United States,* 343 F.2d 573, 577–79 (8th Cir.), *cert. denied,* 382 U.S. 821, 86 S.Ct. 48, 15 L.Ed.2d 67 (1965). The defense had already amply demonstrated the bias of this witness; furthermore, the other government witness, Bluitt, testified that Brigham had admitted

committing the murder. Thus, the evidence sought by Lester was cumulative, and its exclusion was not prejudicial. We therefore find the trial court's ruling to be proper.

### C. Prosecutorial Misconduct

McGill raises various instances of alleged prosecutorial misconduct. Only two are worthy of discussion here. First, McGill argues that the prosecutor's characterization of the jury as "victims" and of an acquittal as a positive message to Felix Mitchell was inflammatory and prejudicial. Second, McGill argues that the prosecutor's implication that the rules of evidence prevented him from introducing evidence of McGill's drug dealing was improper.

■ Both attorneys are allowed reasonably wide latitude in making their closing arguments. Improprieties are not reversible error unless they are so gross as to probably prejudice the defendant, and the prejudice is not neutralized by the trial judge. *United States v. Birges,* 723 F.2d 666, 671–72 (9th Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 1926, 80 L.Ed.2d 472 (1984); *see also United States v. Lane,* 708 F.2d 1394, 1399 (9th Cir.1983) (remarks at closing must be highly prejudicial and affect substantial rights to constitute reversible error).

■ As to the prosecutor's statement in closing argument that "we are all victims" and that an acquittal would be a message to Mitchell that he could stop people from talking to the FBI, the general rule is that appeals for the jury to act as a conscience of the community are not impermissible, unless specifically designed to inflame the jury. *United States v. Kopituk,* 690 F.2d 1289, 1342–43 (11th Cir.1982), *cert. denied,* — U.S. ——, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). These comments, when viewed in conjunction with the numerous references during the trial to the Mitchell drug ring, do not cross the line "demarcating permissible oratorical flourish from impermissible comment calculated to incite the jury against the accused." *Id.*

at 1342. And in the context of this case, wherein virtually all the witnesses were admittedly involved in the Mitchell drug ring, and the alleged conspiratorial objective was to prevent testimony at Mitchell's trial, the prosecutorial remarks were not sufficiently prejudicial as to affect McGill's substantial rights.

McGill also argues that the prosecutor's remark, in response to a defense argument that the only evidence of McGill's guilt was accomplice testimony, constituted prosecutorial misconduct. The prosecutor's remark was that he had not offered evidence of McGill's drug dealing because "the judge [had] already told [the jury] that type of thing is not allowed into evidence." The prosecutor has a special obligation to avoid "improper suggestions, insinuations, and especially assertions of personal knowledge." *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir.1980) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)), *cert. denied*, 452 U.S. 942, 101 S.Ct. 3088, 69 L.Ed.2d 957 (1981). The remark was improper, but we find such error to be harmless. *See United States v. Diaz*, 662 F.2d 713, 717–18 (11th Cir.1981) (per curiam); *cf. United States v. Vaglica*, 720 F.2d 388 (5th Cir.1983) (reference to the rules of evidence was reversible error where the prosecutor thereby implied the existence of evidence that would negate the primary evidence in support of appellant's defense). Here, since the entire trial was replete with references to drug dealing and violence, it is unlikely that such a comment would have had a material effect on the jury's verdict.

We affirm Lester's conviction for conspiracy and set aside the judgments of acquittal on Lester's substantive counts and McGill's conspiracy count and restore the jury verdicts.